JOHN D. BOWERS
Wyoming Bar # 6-3090
Bowers Law Firm, PC
P.O. Box 1550
Afton, WY 83110
Telephone (307) 885-1000
Facsimile (307) 885-1002
*Counsel for the Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| VAN L. HALE | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.   09-CV-245-J |
| | ) | |
| vs. | ) | |
| | ) | |
| ALLIED INSURANCE, | ) | |
| NATIONWIDE INSURANCE, and | ) | |
| John Does 1-3 | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; OBJECTION TO AFFIDAVITS AND MOTION TO STRIKE

COMES NOW the above-captioned Plaintiff by and through his attorneys, John D. Bowers and James K. Lubing hereby submit Plaintiff's Response to Defendant's Motion for Summary Judgment and informs the Court as follows:

### I.     INTRODUCTION

The Plaintiff Van L. Hale was seriously injured when an ATV operated by another person flipped over and landed on top of him.   The ATV was uninsured and operated by a non-family member.   Van L. Hale made a claim upon his uninsured motorist coverage with the Defendants and the Defendants denied coverage.   Specifically, the Defendants claimed that the exclusion stating that vehicles "[d]esigned mainly for use off public roads while not on public roads."

The accident occurred in the Sand Flats Recreational Area in an area known as the Fins and Things Jeep Trial.   The area of the accident was within a marked motor vehicle

route on BLM land, which is managed by the BLM and Grand County, Utah.   The motorized route is marked and designed for the use of ATV's and other motorized vehicles.   The accident occurred in a steep area, however, within the marked boundaries of the route.   Van L. Hale was seriously injured, which resulted in local law enforcement driving to where he was laying after the accident and loaded into an ambulance and then being transported to the local emergency room in Moab, Utah.   The Plaintiff's argument is that the accident occurred on a public roadway and as such, the Defendant's exclusionary language does not apply.   In the alternative, if the Court finds that this is not a public road, as defined under Wyoming law, then the Plaintiff is requesting that the Court find that the exclusionary language contained in the insurance policy is against public policy.   Specifically, but not limited to the fact that Wyoming contains over twenty three million acres of public land and the exclusionary language relied upon by the Defendants would greatly reduce or void the intent of the Wyoming legislature in acquiring uninsured motorist coverage.   In addition to the response contained herein, the Plaintiff respectfully incorporates its motion filed contemporaneously his motion for partial summary judgment filed contemporaneously with this response.

## II.     STANDARD

The Plaintiff generally agrees with the standard set forth by the Defendants in their motion, however, adds the following provisions of law.   Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where there is "no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).   The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party.   *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).   Pleadings and documentary evidence must be construed in favor of the party opposing the motion.   *Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793, 796 (10th Cir.1993).

## III.     STATEMENT OF RELEVANT FACTS

The Plaintiff, Van Hale is married to Susan Hale and resides in Afton, Wyoming where he practices as a chiropractor serving primarily the people of Star Valley,

Wyoming.   (See Van Hale afft. ¶ 3-4.)

Prior to returning to college and chiropractic school Mr. Hale was a sworn Wyoming law enforcement officer for over five years.   As part of his law enforcement training, he attended the Wyoming Law Enforcement Academy, where he graduated and was sworn in as a Wyoming peace officer.   During his law enforcement tenure, he was employed by the Afton Police Department as a patrol officer and supervising sergeant. As part of his duties, he enforced the traffic and highway laws in the Town of Afton and the State of Wyoming.   Because of his training and experience he is aware of the difference between private roads and public roads for the purposes of enforcing the state of Wyoming traffic laws.   Mr. Hale also served as a councilman and mayor for the Town of Afton, which also involved passing and implementing traffic laws for the Town of Afton.   (See Van Hale afft. ¶ 5-7.)

For approximately ten years Mr. Hale has traveled to the Moab, Utah area for recreation.   He has traveled extensively on the roads and trails located on the state and federal lands located near Moab, Utah.   His extensive experience in the area has involved hiking, bicycling, and riding and driving motorized vehicles on the roads and trails on the state and federal lands in Moab, Utah including extensive experience traveling the marked routes within the Sand Flats Recreational Area.   (See Van Hale afft. ¶ 8-9.)

During the times that Mr. Hale has traveled to the Sand Flats Recreational Area, he has had the opportunity to discuss the area with local law enforcement and federal law enforcement.   This is based primarily because of the fact that he was in law enforcement and the common understanding of law enforcement issues.   He became friends with a Grand County deputy that patrolled the Sand Flats Recreational Area and often stayed at property that was managed by the deputy's family when he traveled to Moab, Utah.   (See Van Hale afft. ¶ 10.)

Because of Mr. Hale's law enforcement experience, his extensive travels in the Sand Flats Recreational Area and in-depth discussions with law enforcement officers that patrol the Sand Flats Recreational Area and research he had conducted concerning the rules and regulations of the area prior to his travels he has extensive and in-depth knowledge of the ownership of the Sand Flats Recreational Area, how it is managed, and

the rules and regulations that govern it.   (See Van Hale afft. ¶ 11.)

Attached to Mr. Hale's affidavit is the Sand Flats Recreational Area visitors' guide which in his understanding, opinion, and belief is published in cooperation between a partnership with the Bureau of Land Management and Grand County, Utah.   From Mr. Hale's experience of the area research concerning rules and regulations prior to his travels and in-depth discussions with law enforcement officers, the attached Sand Flats Recreational Area visitors' guide is a fair and accurate representation of the ownership, management, and a synopsis of some of the rules and regulations that govern the use by the public of the Sand Flats Recreational Area.   (See Van Hale afft. ¶ 12.)

The Sand Flats Recreational Area is near Moab, Utah and is described near the federally owned and maintained Arches National Park.   The Bureau of Land Management and Grand County, Utah estimate that it receives over one hundred thousand visitors per year.   In Mr. Hale's extensive travels on the marked routes in the Sand Flats Recreational Area he has personally observed the general public extensively using the area for activities such as, hiking, biking, camping, and motorized vehicle travel.   Mr. Hale has personally met members of the public using the Sand Flats Recreational Area from all over the United States and many individuals from out of the United States.   (See Van Hale afft. ¶ 13.)

In Mr. Hale's ten-plus years in traveling to the Sand Flats Recreational Area, neither the Bureau of Land Management nor Grand County, Utah has ever limited or stopped his travels on the marked routes within the Sand Flats Recreational Area.   The Sand Flats Recreational Area is open for use for all of the public and does charge all of the public and does not limit the use to any portion of the general public.   The Sand Flats Recreational Area is open to the general public throughout the year and throughout the day and night.   At the boundary of the Sand Flats Recreational Area there is a small visitors' station that requires you to pay a small fee for the use of the Sand Flats Recreational Area.   The fees are paid to the Bureau of Land Management and Grand County, Utah to be used for the management of the Sand Flats Recreational Area.   (See Exhibit A – Sand Flats Recreational Area visitors' guide.)   When user fees are paid you receive maps and other information setting forth where the marked routes for travel are in the Sand Flats Recreational Area and other helpful information regarding safety and

regulations of the Sand Flats Recreational Area.   The visitors' office is not open after six p.m. however, and to pay the small user fee, the users are directed to place the small fee in a self-pay envelope and deposit it at the visitor's station.   (See Van Hale afft. ¶ 14, ¶16-17.)

Upon entering the Sand Flats Recreational Area you drive into it on a paved road which continues through part of the Sand Flats Recreational Area and then turns into gravel and dirt roads.   The directions and maps given at the visitor's station provide detailed maps of the routes which are marked and allow motor vehicle traffic.   One of the clearly mapped and marked routes is the Fins and Things 4x4 Jeep Route.   The Fins and Things Jeep Route is open to travel by all motor vehicles including, ATVs and motorcycles.   (See Van Hale afft. ¶ 15, ¶ 18.)

From Mr. Hale's past usage in the area he has personally observed that the Fins and Things 4x4 Jeep Route is patrolled by law enforcement officers.   The route is clearly marked with signs posted directing the vehicle traffic and clearly stating and requiring that motorized vehicles only use the designated route.   Any motor vehicles traveling off of the clearly marked designated route are subject to criminal penalties.   The Fins and Things 4x4 Jeep Route is marked and intended that there is no mistake by the general public as to what the route is because of the criminal fines that are imposed in the event motor vehicles travel off of the designated route.   (See Van Hale afft. ¶ 19.)

On March 28, 2009, Mr. Hale traveled to the Sand Flats Recreational Area with approximately twenty family members and friends.   The purpose of the trip was to use motorized vehicles to travel the Fins and Things 4x4 Jeep Route using motorcycles and ATVs.   The group was made up of males and females ranging from age ten to age fifty-two.   (See Van Hale afft. ¶ 20.)

Traveling with Mr. Hale's group was a nineteen year-old individual named Mark Hale, who is no immediate relation to Mr. Hale.   Mr. Hale knows Mark Hale because he lives in the same Star Valley community.   However, he was a friend of another person in the group and had come with him and joined Mr. Hale's group.   Because of Mr. Hale's limited experience and knowledge of Mark Hale, Mr. Hale had no knowledge of Mark Hale's driving abilities or operation of ATV's, however, Mr. Hale assumed he had extensive experience riding ATVs because it was his knowledge that Mark Hale's family

owned and operated a small ranch in the Star Valley, Wyoming area.   (See Van Hale afft. ¶ 23.)

After paying the user fee at the visitor's center at the Sand Flats Recreational Area, Mr. Hale's group traveled to the Fins and Things 4x4 Jeep Route.   During the group's approximately two hours of travels Mr. Hale observed motorized vehicles using Fins and Things 4x4 Jeep Route ranging from motorcycles to Jeeps and other 4-wheel drive vehicles.   Throughout the day the group encountered other members of the public using the Fins and Things 4x4 Jeep Route and the group would yield and obey the rules and regulations of driving on the public area.   (See Van Hale afft. ¶ 21-22.)

After using the motorized vehicles to travel on the Fins and Things 4x4 Jeep Route for approximately two hours the group came to a portion of the Route that was on a sandy roadbed that abruptly turned into a steep rocky incline.   Approximately half of the group rode through the sandy area on the Fins and Things 4x4 Jeep Route and up the marked rocky incline to the top.   This area was clearly marked as being part of the route and had markings placed upon the rocky surface by the BLM and/or Grand County, Utah, indicating that is was the marked route and in addition there were signs posted on the edge warning that outside of the route was closed and only the marked route could be used for motorized vehicle traffic.   (See Van Hale afft. ¶ 24.)

When Mark Hale drove to the edge of the sandy road to the beginning of the rocky incline, he indicated that he would like some assistance in traveling up the rocky incline. Mr. Hale then walked over to Mark Hale and because of his need for assistance and his uncertainty, Mr. Hale sat on the front of Mark's 4-wheeler while other members of the party explained to him to go slow and to follow the route as marked.   At this point Mr. Hale was still under the assumption that Mark Hale knew how to operate an ATV and that he would travel up the marked route in a slow and safe manner.   Mr. Hale had not observed or had any indication that Mark Hale had operated an ATV in a negligent manner or was a dangerous and had not seen him doing anything unsafe or dangerous during our two hours that day.   (See Van Hale afft. ¶ 25-26.)

As Mr. Hale sat on the ATV, Mark Hale drove on the sand until the front wheels of his ATV made contact with the rocky incline.   At this point Mark Hale, for some negligent reason, caused the ATV to accelerate and lunge forward.   The combination of

the front wheels making contact with the steep incline and the great acceleration of the ATV caused Mr. Hale to be thrown from the ATV landing on the sandy road.   The ATV being driven by Mark Hale then flipped over and landed on Mr. Hale causing severe pain and damage to his body.   (See Van Hale afft. ¶ 27.)

Attached to Mr. Hale's affidavit are five photographs that were taken at the time of the accident or immediately after the accident.   They are fair and accurate representations of the scene and the activities that followed the accident described. (See Exhibit B.)   (See Van Hale afft. ¶ 28.)   In Exhibit B, the first photograph shows the route just seconds before Mark Hale accelerated, throwing Mr. Hale from the ATV and the ATV landing on top of Mr. Hale.   The second picture shows Mr. Hale's position on the sandy road after the ATV had been lifted from Mr. Hale.   The third picture shows first aid being administered to Mr. Hale by emergency medical technicians lying in the same state as when the ATV had been lifted from Mr. Hale.   The fourth picture shows the ambulance that drove directly to Mr. Hale and the law enforcement officer that responded to the scene.   The fifth picture shows Mr. Hale being lifted from where he had been injured into the back of the ambulance to be transferred to the emergency room located in Moab, Utah.   (See Van Hale afft. ¶ 29.)

When the ATV driven by Mark Hale landed on Mr. Hale, it caused severe injuries to his body, specifically, but not limited to: causing three fractures to Mr. Hale's pelvis and one to his sacrum; Mr. Hale's lumbar spine was fractured in eight areas and four of his ribs were broken; Mr. Hale's right arm and wrist were broken, which ultimately required significant surgery.   (See Van Hale afft. ¶ 30.)

Because Mr. Hale's injuries were so severe, he was transported to the University of Utah for more surgery and treatment.   Part of his surgery required that four screws and a plate were placed in the radius of his arm with nine smaller screws to stabilize it. Three more screws were placed in his arm to hold the ligaments in place and three pins were inserted through his wrist in an attempt to stabilize it.   Because of Mr. Hale's severe injuries he had to spend more than a week in the hospital with significant therapy and treatment after he was released.   The injuries have left Mr. Hale with permanent injuries and extensive medical bills.   (See Van Hale afft. ¶ 31.)

Because of the injuries caused to Mr. Hale by the ATV ridden by Mark Hale, he

has incurred medical bills in excess of $90,000.00 and has lost over $30,000.00 from his business as a chiropractor.   Additionally, Mr. Hale has been told he will need further surgery on his wrist in the future and the wrist may ultimately need to be fused limiting or incapacitating his ability to work in his profession as a chiropractor.   (See Van Hale afft. ¶ 32.)

Prior to the accident, Mr. Hale and his wife, Susan, had obtained uninsured motor vehicle insurance through Allied Insurance on four of their vehicles with each vehicle carrying uninsured motorist insurance in the amount of $100,000.00 for each person. (See Van Hale afft. ¶ 34.)

After the accident, Mr. Hale made claim to Allied Insurance for the uninsured motorist coverage benefits and his claim was denied by Allied Insurance.   Mr. Hale was informed that the ATV driven by Mark Hale was not covered by any type of liability insurance and was an insured motor vehicle stating that the route that Mr. Hale was injured on was not a public road.   (See Van Hale afft. ¶ 33, ¶ 35-36.)

## IV.     DISCUSSION AND ARGUMENT

A.   Relevant statutory and case law.

Wyoming mandates that uninsured motorist coverage be offered in the State of Wyoming pursuant to W.S. § 31-10-101.

Wyo. Stat. § 31-5-102 in defining definitions for that act states in relevant part:

a) Except as otherwise provided, as used in this act:

. . .

(xxiv) "Motor vehicle" means every vehicle which is self-propelled except vehicles moved solely by human power and motorized skateboards as defined by paragraph (a)(lxii) of this section;

. . .

(xxxiv) "Private road or driveway" means every way or place in private ownership and used for vehicular travel by the owner and those having express or implied permission from the owner, but not by other persons;

. . .

(xl) "Roadway" means that portion of a highway improved, designed or ordinarily used for vehicular travel, exclusive of the sidewalk, berm or shoulder. In the event a highway includes two (2) or more separate roadways the term "roadway" as used herein shall refer to any such roadway separately but not to all such roadways collectively;

. . .

(xlix) "Street or highway" means the entire width between the boundary

lines of every way publicly maintained or if not publicly maintained, dedicated to public use when any part thereof is open to the use of the public for purposes of vehicular travel;

. . .

W.S. . § 31-5-102

The Wyoming Supreme Court has set the basic tenants of an insurance policy construction as follows:

1. "[T]he words used will be given their common and ordinary meaning.
Neither will the language be 'tortured' in order to create an ambiguity."

2. "The intention of the parties is the primary consideration and is to be ascertained, if possible, from the language employed in the policy, viewed in the light of what the parties must reasonably have intended."

3. "Such [insurance policy] contracts should not be so strictly construed as to thwart the general object of the insurance."

" . . . [T]he parties have the right to employ whatever lawful terms they wish and courts will not rewrite them."

4. "Absent ambiguity, there is no room for construction and the policy will be enforced according to its terms."

5. " . . . [W]here such [insurance policy] contracts are so drawn as to be ambiguous and uncertain and to require construction, the contract will be so construed liberally in favor of the insured and strictly against the insurer. Also, if the contract is fairly susceptible of two constructions, the one favorable to the insured will be adopted."

*Farmers Ins. Exchange v. Williams*  823 F.Supp. 927, 931 (D.Wyo.,1992)(citing *Commercial Union Insurance Co. v. Stamper,* 732 P.2d 534, 539 (Wyo.1987) (alteration in original)).

When a court interprets and considers uninsured motorist coverage, a certain amount of the determination is mandated by public policy considerations. *Farmers Ins. Exchange v. Williams*  823 F.Supp. 927, 931 (D.Wyo.,1992).   The Wyoming Uninsured Motorist Act is designed to furnish protection, by insurance, for victims of uninsured motorists and thus, any ambiguous language should be liberally construed in favor of the insured with strict and narrow construction given to exclusions.  *State Farm Mut. Auto. Ins. Co. v. Shrader*, 1994, 882 P.2d 813.

The Wyoming Supreme Court has defined what a public road is in several factual situations ranging from violations while operating a motor vehicle to interpretation related to the private road statutes.   Examples of the Wyoming Supreme Court's analysis concerning public roads are:

> Considering the statutory definitions of "highway" set forth above, we find no ambiguity. Upon simple reading of these definitions and application of the plain and ordinary meaning of those words, we clearly discern the legislature's intent that the term "highway" include a road that is either 1) publicly maintained, or 2) dedicated for public use in such a manner that any part is open for use by the public for purposes of vehicular travel. We further determine that in a situation where a road is not publicly maintained, it is *not* required that the road be either formally statutorily dedicated, as asserted by Petitioner, or dedicated in common law as allowed under established Wyoming case law for the road to be deemed a "highway." Rather, in such an instance, the proper interpretation of the legislature's intent is that the road merely be dedicated for public use through the opening of any part of it for use by the public for purposes of vehicular travel

*McClean v. State*  62 P.3d 595, 598 -599 (Wyo.,2003)

> The status of BLM roads has been considered by at least one other court. In Major v. Douglas County, 1971, 6 Or.App. 544, 488 P.2d 808, the court there considered the test to be the right of the public to use it. There, like here, the general public had for many years enjoyed the right to use the BLM road; so, therefore, it was a public road within Oregon statutory language, "any public road within the county." That holding is no different conceptually than the general one used in the absence of an applicable statutory definition. A public road is one that the public generally not merely a portion of the public is privileged to use. Within the facts reflected by the record, then, we must conclude that the BLM road is a public road within the terms of s 24-9-101.

*McGuire v. McGuire*  608 P.2d 1278, 1288 (Wyo., 1980)(citations omitted)

> Therefore, we hold, as a matter of law, a road over federal lands may be considered a public road within the meaning of our private road statutes, provided the characteristics of the road indicate it is available to the general public.

*Reidy v. Stratton Sheep Co.*  135 P.3d 598, 606 (Wyo.,2006)

B.    Wyoming Law controls the contract and what is defined as a public road.

The insurance policy in this case was issued under the laws of the State of Wyoming and the intent of the parties was that it would be construed and interpreted under the law of Wyoming; otherwise, both parties would be putting themselves at risk for interpretations of law in other states and there would be no clear authority for which either part could rely upon in determining their contract.   As such, the issues in this case, specifically defining what a pubic road is should be decided under the laws of the State of Wyoming and not another state. The uninsured motorist coverage issued in the insurance policy specifically states "Uninsured Motorist Coverage-Wyoming."

Choice-of-law decisions are factors set by the forum state.   A Federal Court's interpretation of an insurance policy in a diversity case is governed by state law. *Allstate Ins. Co. v. Burrough*, 120 F.3d 834 (8th Cir. 1997).   Contracts are to be construed by law of state where made, except where made in one state to be performed in another, when law of state of performance will govern, unless contrary intention clearly appears.   *J.W. Denio Milling Co. v. Malin,*  165 P. 1113 (Wyo. 1917)

The Tenth Circuit has set forth the factors for deciding choice –of-law questions as:

§ 188. Law Governing In Absence Of Effective Choice By The Parties

 (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

 (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

*Mitchell v. State Farm Fire & Cas. Co.*  902 F.2d 790, 793 (C.A.10 (Colo.),1990)(Citing REST 2d CONFL § 188 )

Applying these factors to the case at hand, there is no question that the laws of the state of Wyoming govern the interpretation of what a pubic road is.

C.   Area that Van Hale was injured on is a public road under the laws of the State of Wyoming.

The Defendants have denied coverage based on their allegation that the accident did not occur on a public road.   The uninsured motor vehicle motorist coverage is mandated by the State of Wyoming pursuant to Wyo. Stat. § 31-10-101.   As such, exclusions to uninsured motorist coverage should be strictly construed against the insurance company.   *Farmers Ins. Exchange v. Williams*  823 F.Supp. 927, 931 (D.Wyo., 1992)

As stated by a Washington Court, "Because of the important policy considerations inherent and excluding coverage to large classes of persons, courts strictly scrutinize exclusions to see whether they comport with public policy."   *Allstate Ins. Co. v. Wyoming Ins. Dept.*  672 P.2d 810, 816 (Wyo.,1983).   Courts more closely scrutinize the exclusions in uninsured motorist coverage policies because uninsured motorist coverage is mandated.   *Winegeart v. American Alternative Ins. Corp.*  224 Fed.Appx. 807, 809, 2007 WL 987429, 2 (C.A.10 (Wyo. (C.A.10 (Wyo.),2007)

Taking into consideration the fact that uninsured motorist coverage is mandated in Wyoming, then the Plaintiff would urge the Court to use the most liberal and broadly construed interpretation of public roads.   In the present case, Van L. Hale was injured while traveling on a publically owned and maintained route in the Sand Flats Recreational Area on a portion referred to as the Fins and Things Jeep Trail.   The route is publically owned by the Federal Government under the BLM and managed in cooperation with Grand County, Utah.   (¶Affidavit of Van Hale ¶ 17, 18, 19, 24).   The

route was open and marked for public travel although it is primarily used by ATVs and 4-wheel drive vehicles.   (¶Affidavit of Van Hale ¶ 18).   The accident that Van L. Hale was injured at was on the BLM and Grand County designated route and marked and controlled by the BLM and Grand County, Utah.   (Affidavit of Van L. Hale ¶ ¶ 17, 18, 19, 24).

The route in which Van L. Hale was injured is a marked motor vehicle route in the Sand Flats Recreational Area. (Affidavit of Van L. Hale ¶ 24).   Close to 100,000 visitors use the Sand Flats Recreational Area each year (Sand Flats Recreational Visitor Guide p. 1).   The public that uses the area are required to follow the BLM and Grand County Utah's posted rules and regulations; specifically the public is required to stay on the designated routes (Sand Flats Recreational Visitor Guide p. 3) (Hale Affidavit ¶ ¶ 17, 18). OHV vehicles such as ATVs, such as the one that Van L. Hale was injured by, are allowed to be driven on the designated roads and trails within the Sand Flats Recreational Area (Sand Flats Recreational Visitor Guide p. 4) (Hale Affidavit ¶ ¶ 17, 18).   Part of the restrictions placed on the public on using the area include age restrictions, helmets, spark arresters, headlights and taillights in addition to traveling only on the designated roads and trails (Sand Flats Recreational Visitor Guide p. 4).

The route that Van L. Hale was traveling when he was injured is one of the "most popular jeep" routes in the Sand Flats Recreational Area (Sand Flats Recreational Visitor Guide p. 8).   The public who utilize the Sand Flats Recreational Area must pay a posted user fee.   (Hale Affidavit ¶ 17).   The fees are used to benefit the public and the program including general maintenance in maintaining the routes, fences and signs (Sand Flats Recreational Visitor Guide p. 3).   The public partnership between the BLM and Grand County, Utah has stated that their mission in managing these public lands is in part to "provide for public safety; assure the continuation of positive economic benefits to the county associated with public use of the area; and maintain reasonable public access to the area for recreational and other sustainable uses." (Sand Flats Recreational Visitor Guide p. 1).

Other important factors in demonstrating to the Court this was a public road as defined by the State of Wyoming is that Van L. Hale was injured when the uninsured ATV operated by another person flipped over and landed on top of Van L. Hale after he

was thrown from the vehicle and lying on the sandy roadway. (Hale Affidavit ¶ 27). Because of Mr. Hale's severe injuries, Mr. Hale was not moved until law enforcement and emergency medical technicians could arrive at the scene. (Hale Affidavit ¶ 29).   The law enforcement officer that arrived at the scene drove on the marked public route directly to Van L. Hale's location, where he stopped his patrol truck next to Mr. Hale and administered emergency first aid. (Hale Affidavit ¶ 29).   A four wheel drive ambulance drove on the Fins and Things route to Mr. Hale's location, where the emergency medical technicians administered first aid and then placed Mr. Hale into the ambulance for transportation (Hale Affidavit ¶ 29).

For the Court's convenience, the Plaintiff has attached pictures of the incident immediately after Mr. Hale's accident, which are representative of the scene described in this paragraph (Exhibit B).   In Exhibit B, the first photograph shows the route just seconds before Mark Hale accelerated, throwing Van Hale from the ATV and the ATV landing on top of him.   The second picture shows Van Hale's position on the sandy road after the ATV had been lifted from him.   The third picture shows first aid being administered to Van Hale by emergency medical technicians lying in the same state as when the ATV had been lifted from him.   The fourth picture shows the ambulance that drove directly to Van Hale and the law enforcement officer that responded to the scene. The fifth picture shows Van Hale being lifted from where he had been injured into the back of the ambulance to be transferred to the emergency room located in Moab, Utah.

In the case of *McGuire v. McGuire*  608 P.2d 1278 (Wyo., 1980), the Court determined that a BLM road was a public road.   In making the determination, the Wyoming Supreme Court stated that "a public road is one that the public generally not merely a portion of the public is privileged to use." *Id. (*citations omitted).   The *McGuire* case dealt with a private road issue under the private road statutes of the State of Wyoming.   The *McGuire* decision was modified by the Wyoming Supreme Court in case of *Reidy v. Stratton Sheep Co.* that in the setting of a private road, that a BLM road may be considered a public road if "characteristics of the road indicated is available to the general public." *Id.* at 606.   The *Reidy* case again dealt with the establishment of a private road under the private road statutes of the State of Wyoming.   The *Reidy* Court pointed out that "we must, therefore define a public road in the general sense, keeping in

mind what the enacting legislature must have intended at the time of the passage of the act, when the state was just coming to life." *Id.* at 604.   In the *Reidy* case, some of the factors that the Court pointed to was that the road had been opened to the general public for more than forty years, it had been used by tourists, hunters, ranchers, farmers, and even motorcyclists.   The *Reidy* Court stated that roads over federal lands may be considered public roads under the Wyoming private roads statutes, however, the individual characteristics of each road is to determine its status.   *Id.* at 608.

Given the facts of the present case, under the *McGuire* case and the *Reidy* case*,* the route that Van L. Hale was traveling on when he was injured by the uninsured motor vehicle would be considered a public road.   The route is a marked route on public lands, which are owned, operated and managed by the BLM and Grand County Utah.   A user fee is charged to use the motorized route; however, the fee is used for the public benefit in maintaining and operating the area.   The area is open to "all" of the public (Hale Affidavit ¶ 16)

In *McClean v. State*   62 P.3d 595, 598 -599 (Wyo.,2003), the Wyoming Supreme Court held that the roadway within a mobile home part was a "highway dedicated to public use" within the meaning of the Wyoming Statutes governing the operation of motor vehicles by individuals who have a suspended driver's license.   The *McClean* Court pointed to the fact that under the Wyoming Statutes, highways or streets, when any part of the route is open to the use of the public for purposes of vehicular travel, or publically maintained, or dedicated to the public. *Id.* at 599.   One of the primary factors that the *McClean* Court focused on was whether the area was dedicated to public use. *Id.*

The factors that the *McClean* Court looked at was that the area was not closed to the public, members of the public could drive through the area, that there was mail delivery and other services including patrol by law enforcement in the area and that there were no other indications that the area was private. *Id.*   The primary focus of the *McClean* Court was that the facts demonstrated that it was the "intention to allow the public to use those roads for vehicular travel" within the area. *Id.*   Additionally, the *McClean* Court pointed out that the public has exercised its ability to use the roads by traveling on them in their vehicles. *Id.* at 599-600.

The *McClean* case can be argued as an even more liberal interpretation of what a public road is defined as in the State of Wyoming.   In essence, it is the intention to allow the public use that is the primary factor.   The area that Van L. Hale was injured in is a marked public route, used by the general public (Hale Affidavit ¶ 24).   The area is part of public lands and is a marked route intended for motorized vehicle use.   For example, in 2001, the Department of Interior placed additional restrictions on the area citing the need to better regulate the motorized vehicle routes such as the one that Van L. Hale was traveling on when he was injured.   (Federal Register vol. 66, no. 114 Monday January 22, 2001/notices).   As part of the basis for imposing the new travel restrictions, the Department of Interior stated that "these actions are necessary to halt ongoing impacts and prevent future degradation of resource values.   They are being implemented on an interim basis to protect resource values and public safety." (Supra, at 6659).   In managing the route and area that Van L. Hale was injured on, the BLM seeks the public comments in the management of the area by the Bureau of Land Management.   (Federal Register May 3, 2004 vol. 69 no. 85).

In determining if the route that Van L. Hale was injured on is a public road under the *McClean* case, the intent is clear that the route and this area is owned by the public and intended to be traveled upon by the public.   As with any public road, there are restrictions such as requiring that the public stay on the designated routes and that a fee is charged for the public use to benefit the public.   The user fee charged for the area does not restrict the use of the general public to any portion of the public, but rather is simply a fee to benefit the public's use and maintenance of the area. (Hale Affidavit ¶ 17). The user fee can be related to that of the public paying a toll to use a public road in other parts of the country.

In strictly construing the exclusions of the Defendant, the facts of this case establish as a matter of law that Van L. Hale was injured while on a public road. Although its characteristics are somewhat different in that it was a 4x4 route, nevertheless, it was open to the public for motorized vehicle traffic.   The characteristics of this public roadway can be stated as being similar to the differences between I80 which travels through Wyoming and some of the steep mountain passes of Wyoming. Although their characteristics are different, the key factor is that they are designated

routes open to the public for motorized vehicle use.   In this case, the route was owned by the public, designated for public use, and intended for the public to use motorized vehicles on.

As a secondary source, American Jurisprudence 2nd, contains a definition of a public road based upon case law throughout the United States.   As part of the American Jurisprudent definition, it states "whether a road is public or private is determined by the extent of the right to use it and not by the extent to which the right is exercised or by the quantity of travel over it."   39 Am. Jur. 2d Highways, Streets, and Bridges § 3 (citing *Anderson v. Richards*, 608 P.2d 1096 (1980) and *McGuire vs. McGuire*, 608 P.2d 1278 (1980)).

Under the *McGuire* case, the *Reidy* case and the *McClean* case, the facts of this case establish that Van L. Hale was injured on a public road and as such, the Defendant's exclusion does not apply.   The Plaintiff respectfully requests that the Court find as a matter of law that the route traveled by Van L. Hale at the time he was injured is a public road as defined under Wyoming laws.

D.    The Defendants exclusion and interpretation of the exclusion is against Wyoming public policy.

Because this case deals with uninsured motorist coverage, public policy considerations are of the utmost importance in determining if the Defendant's exclusion applies.   *Farmers Ins. Exchange v. Williams*  823 F.Supp. 927, 931 (D.Wyo.,1992).   As pointed out by the Wyoming Supreme Court, public policy is not easily defined

> It was said in *Mutual of Enumclaw Insurance Company v. Wiscomb,* 25 Wash.App. 841, 611 P.2d 1304, 1307 (1980):
>
> " 'Public policy is a term not easily defined. Its significance varies as the habits and needs of a people may vary. It is not static and the field of application is an ever increasing one. A contract, or a particular provision therein, valid in one era may be wholly opposed to the public policy of another .... Courts keep in mind the principle that the best interests of society demand that persons should not be unnecessarily restricted in their freedom to contract. But they do not hesitate to declare void as against public policy contractual provisions which clearly tend to the injury of the public in some way.' " *Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A.2d 69, 94-95 (1960), quoted with approval in *Baker v. Seattle,* 79 Wash.2d 198, 200-01, 484 P.2d 405 (1971). See also *McCutcheon v. United Homes Corp.,* 79 Wash.2d

443, 486 P.2d 1093 (1971)."

*Allstate Ins. Co. v. Wyoming Ins. Dept.*  672 P.2d 810, 816 (Wyo.,1983)

In addition, the Wyoming Supreme Court has stated that "because of the important policy considerations inherent in excluding coverage to large classes of persons, courts strictly scrutinize exclusions to see whether they comport with public policy."  *Id.* at 816.   The general rule concerning interpretation of exclusions when dealing with uninsured motorist coverage, is that the exclusions should be strictly construed against the insurance company.   *Id.* at 816-818; *Couch on Insurance* 2d, § 45:692, p.330.

In the case of *Allstate Ins. Co. v. Wyoming Ins. Dept.*, the Wyoming Supreme Court weighed heavily the public policy and ultimately determined that the "household exclusion clause" contained in some uninsured motorist insurance policies was invalid and void based in part because it was against the public policy of the State of Wyoming. The *Allstate* Court pointed out that although parties to an insurance contract may limit their rights and liabilities, they cannot do so when it is "inconsistent with public policy." *Id.* at 816.   The *Allstate* Court, citing a Washington Court, summarized how these types of exclusions should be scrutinized by stating:

> "Because of the important policy considerations inherent in excluding coverage to large classes of persons, courts strictly scrutinize exclusions to see whether they comport with public policy"

*Id.* (citations omitted)

In the case at hand, uninsured motorist coverage is mandated by the State of Wyoming.   Van L. Hale obtained and purchased the uninsured motorist coverage and paid his premiums.   His expectation was that he would be protected by the negligent use of an uninsured motorist vehicle as in the incident in this case.   He was traveling upon a route that is owned by the public, managed by the public, and intended for motorized vehicle use.   After being severely and permanently injured, Van L. Hale made a claim upon his uninsured motorist policy to find that the Defendants are arguing that an exclusion applied.   Specifically, that while traveling upon public lands on a designated route, following the rules and regulations of the BLM and Grand County, it was their position that it was not a public road.

Through its various agencies, the Federal Government owns <u>over fifty percent</u> of the land in the State of Wyoming.   *Reidy v. Stratton Sheep Co.* (citations omitted).   If the route that was traveled upon by Van L. Hale is not a public road under the Court's interpretation, Wyoming citizens who purchase uninsured motorist coverage in the State of Wyoming could be subject to the same exclusion if injured by a motor vehicle on a route designated as a road on over fifty percent of Wyoming's land.   Certainly pointing out that the Defendant's exclusion has two parts, but the point being that routes that the citizens of the State of Wyoming travel could be affected by allowing insurance companies to write exclusions that limit mandatory coverage on federally owned property in the State of Wyoming.   If the routes on public lands in Wyoming are not paved and regulated just as the one Van Hale traveled on.   Ranches, emergency workers and many other Wyoming citizens travel these roads every day.   The effect of finding these roads on Federal lands are not public roads would change the interpretation of uninsured motorist coverage on 50% of the lands in Wyoming.   It would also make a detrimental inconsistency.   For example, a person injured by an uninsured ATV on a rarely traveled route on a county road would not be excluded from coverage.   But a person injured on a well traveled rote to access Federally owned property would be subject to the exclusion and not covered.

The Defendant's interpretation if allowed to stand will drastically modify the landscape of insurance coverage on publically owned land in the State of Wyoming.   The Defendants are in essence attempting to state that when a person travels upon federally owned land on a designated route, that it is not a public roadway.   With over fifty percent of Wyoming ground being owned by the federal government, this interpretation if allowed to stand, would impact the individuals who travel routes on public lands and would benefit insurance companies.   As such, the Plaintiff would ask the Court to find that the Defendant's interpretation of a public road is against the interest of the citizens of the State of Wyoming and all individuals who use and travel the public lands within the State of Wyoming.

<u>E.    The stacking of two policies in this case should be allowed in that there are two insured and thus two policies.</u>

On the declaration page which was issued to Van Hale and Susan Hale states that

the:

|                              |                              |
|------------------------------|------------------------------|
| Named insured and address    | Hale, Van L.                 |
|                              | Hale, Susan B.               |
|                              | PO Box 488                   |
|                              | Afton, Wyoming 83110-0488    |

The declaration page goes on to list uninsured motorist protection for four vehicles setting the amounts at $100,000.00 per person and $300,000.00 each accident related to the vehicles (see attached declaration page.)   On page 2 of the policy and definitions section the policy states:

> A.   Throughout this policy, "you" and "your" referred to
>   1.   The "named insured" shown in the declarations; and
>   2.   The spouse if a resident of the same household.

The insurance policy at hand is not a single policy but rather two policies, one issued to Van Hale and one issued to Susan Hale.   Under the definition section if the policy were just one policy, it would have listed just Van Hale and then by the definition would have included his spouse in the coverage.   Rather the policy specifically lists two insured on the declaration page and based upon this there are two and as such is at the very least an ambiguity whether there is one policy or two.   As further evidence that there were two policies issued, a letter dated June 2, 2009 from the Defendants, addressed the letter to Van and Susan Hale rather than to just Van Hale (see attached letter dated June 2, 2009).

In *Commercial Union Ins. Co., v. Stamper,* 732 P.2d 534 (Wyo. 1987) the court states that for stacking to be prohibited the court needs to find that only "one single and individual policy exists."   *Id.* at 541.   The cases cited by the defense are distinguished in that they listed only one individual name on the policy with several vehicles.   In the present case, the policy lists two separate individuals, Van Hale and Susan Hale.   The definition section of the policy specifically state that the spouse of each person listed, if living in the same household is also considered an insured, being an indication that in this case there are two separate and distinct insurance policies, one for Van Hale and one for Susan Hale.

<u>F.   There are material issues of fact in dispute whether the Defendants acted in bad faith.</u>

On June 1, 2009, the Defendant sent a letter to Van Hale and stated in the letter, "based on the limited information we have regarding this claim, we are issuing this brief letter advising you that some coverage issues exist regarding to this loss."   This letter was in response to Mr. Hale's making a claim to the Defendants for uninsured coverage based on his accident injuries described herein (see attached letter dated June 1, 2009 from Nationwide Insurance to Van Hale).   On the same date, June 1, 2009, the Defendant sent a letter to Mr. and Mrs. Imeson stating that they wanted to talk to them about the ATV accident (see attached letter dated June 1, 2009 to Mr. and Mrs. Imeson).

On June 2, 2009, one day after the first letter, the Defendant sent a "reservation of rights" letter to Van L. Hale and Susan Hale.   On page 3 of the June 2, 2009 letter under "C. Analysis" the Defendants tell the Plaintiff that "the Personal Auto Policy specifically does not cover injuries arising out of the use of vehicles designed mainly for off road use."   The letter goes on to deny coverage and states that to continue the investigation Van Hale must provide the following information:

1. Statement from Van Hale. Thank you for arranging a time later this week.
2. List of all witnesses with contact information.
3. Contact information for Teresa Imeson, the owner of the all terrain vehicle.
4. Make, model and vehicle identification number of the all terrain vehicle involved
5. Documentation of coverage, including any denial of coverage, from all applicable sources of recovery including but not limited to the personal auto policy for Mark Hale, the personal auto policy for Teresa Imeson, any recreational vehicle policy applicable for Mr. Hale and Ms. Imeson, and homeowner's insurance coverage for Mr. Hale and Ms. Imeson.

In the June 2, 2009 letter to Van Hale and Susan Hale, the Defendants misrepresented what the exclusionary language of their policy actually stated.   The Defendants' letter June 2, 2009 misrepresented the policy to Van Hale and Susan Hale. The letter stated that the personal auto policy does specifically not cover injuries arising out of the use of vehicles designed "mainly for off-public road use."   However, the actual language of the policy exclusion states that vehicle "designed mainly for use off public roads while not on public roads" are excluded.   There are two parts to the exclusion and the Defendants told the Plaintiff that the policy excluded all off-road vehicles, which was

a misrepresentation.   The letter from the Defendants dated June 2, 2009 is evidence that the Defendants had not conducted a reasonable investigation and were misrepresenting the policy to the insured.   As of June 2, 2009 the Defendants were investigating the claim to see if the vehicle that injured Van Hale was an off-road vehicle and if so, then they were going to deny coverage ignoring the specific language of the exclusion in misrepresenting the fact to the Plaintiff.

Additionally, the letter of June 2, 2009 requiring Van Hale, who was still recovering from his significant injuries, to do the laundry list requested was reasonable. The Defendants have not provided the Court with any authority that requiring an injured insured to attempt to obtain "documentation of coverage" from all applicable sources of recovery including the "personal auto policy for Teresa Imeson" and "any recreational vehicle policy applicable for" Mark Hale and Teresa Imeson's home owners insurance coverage was reasonable.

Attempting to place the burden on an injured insured to go out and do their investigation is not reasonable and is a material fact establishing that the Defendants acted in bad faith in their investigation.

On July 9, 2009, only seven days after the letter which the Defendants misrepresented the exclusions, they sent a letter to Van Hale, through his attorney, stating that they were denying coverage and that their "research indicates that Utah law would not consider the 'Fins and Things Trail' to be a public road."   (See attached July 9, 2009 letter.)   Additionally, they stated, "we reviewed the Wyoming case you cite, but found this case to be distinguishable."   In the June 9, 2009 they did not make reference to any Wyoming case law that would establish that the area that Van Hale was injured on was not a pubic road.   Rather it can be argued that they were simply trying to find another state's law to argue that it was not a public road.   They cited no Wyoming case law, nor did they indicate in any matter in their July 9, 2009 letter that there was any Wyoming case law that supported their position that the area was not a public road.

As evidence of the Defendants' bad faith investigation, it was not until October 27, 2009 that the Defendants asked for a copy of the video of the accident or photos of the accident.   (See attached October 27, 2009 letter from Nationwide.)   The October 27, 2009 letter was sent after the Plaintiff was forced to inform the Defendants that they

intended to file a complaint because of their belief that they were acting in bad faith. Another factual issue that established the investigation was done in bad faith is that the Defendants never requested medical records of Van Hale (Chadwick Depo. Page 79). On the other hand, the Defendants attempt to argue that they conducted a reasonable investigation based on an affidavit containing conclusionary statements and hearsay statements, such as; Mr. Hale's attorney told the adjustor that she was a nice person but yet they would need to file a complaint.

The affidavits the Defendants are conclusionary and are not based upon personal knowledge, nor do they contain information that establishes that there are no material facts in dispute and the actions of the Defendants were within industry standards.   On the other hand, as pointed out by the Plaintiff there is a significant material of fact in dispute based upon the Defendants own correspondence and misrepresentation to the Plaintiff.

A claim is not "fairly debatable" simply because an insurance company looks to other states laws to try to enforce an exclusion to try to get out of paying uninsured motorists coverage.   The uninsured motorist coverage provision is a established by the statutes of Wyoming in force and regulated by the insurance commission and the courts of Wyoming and certainly arguing that it be interpreted by the state of Utah is an additional fact that they Defendants were acting in bad faith.

One Federal Court in the State of Colorado succinctly summarized the defendant's burden and its analysis in a similar case as:

> "For an insured to prevail on a bad faith claim against an insurer, the insured must establish the insurer acted unreasonably, causing damages to the insured." *Bankr.Estate of Morris v. COPIC Ins. Co.,* 192 P.3d 519, 523 (Colo.App.2008) (citing *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138, 1142 (Colo.1984)). Furthermore, "[t]he question of whether an insurer has breached its duties of good faith and fair dealing with its insured is one of reasonableness under the circumstances." *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138, 1142 (Colo.1984). The reasonableness of an insurer's conduct, in turn, is gauged objectively, based on proof of industry standards. *Bankr.Estate of Morris,* 192 P.3d at 524 (citing *Travelers Ins. Co. v. Savio,* 706 P.2d 1258, 1274 (Colo.1985)). Finally, "[w]hen conflicting evidence exists, what constitutes reasonableness under the circumstances is ordinarily a question of fact for the jury." *Bankr.Estate of Morris,* 192 P.3d at 524 (citing *Rine v. Isham,* 152 Colo. 411, 382 P.2d 535, 537 (1963); *Scoular Co. v. Denney,* 151 P.3d 615, 620 (Colo.App.2006)).

In the present case, there are genuine issues as to disputed material facts regarding State Farm's denial of Ms. Eppich's claim. Because the facts regarding the underlying denial of Ms. Eppich's claim are not fully developed, the Court is not in a position at this time to make a determination as to the reasonableness of State Farm's conduct. Therefore, State Farm is not entitled to judgment as a matter of law on Ms. Eppich's bad faith breach of contract claim either.

*Eppich v. State Farm Mut. Auto. Ins. Co.* , *Slip Copy* 2009 WL 3162245, 6 (D.Colo.) (D.Colo.,2009)

The Defendants have attempted to interpret an exclusion in a manner that is not only inconsistence with the purposes of the uninsured motorist statute but also with public policy.   If the court finds that the road that Van Hale was injured on was a public road under Wyoming law, then a material facts are in dispute. The defendants misrepresentations of what a public road is demonstrates additional facts showing bad faith.   The investigation, exclusion and denial are all evidence of the Defendants bad faith and certainly are material facts in dispute.   As such, the Plaintiff requests that the motion be denied.

## V.     SUMMARY

The Plaintiff respectfully requests that the Court deny the Defendants' Motion for Summary Judgment, because there are material facts in dispute.

RESPECTFULLY SUBMITTED this 10th day of September, 2010.

/s/   *John D. Bowers*

John D. Bowers
Bowers Law Firm, PC
P.O. Box 1550
Afton, WY 83110
Telephone: 307-885-1000
Facsimile: 307-885-1002

Attorney for the Plaintiff

CERTIFICATE OF SERVICE

I certify that the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment was served this 10th day of September, 2010, and that copies were served as follows:

Gary T. Dance                              [_____]    US Mail
Moffatt, Thomas, Barrett, Rock             [_____]    Fed Ex
& Fields, Chartered                        [_____]    Facsimile
P.O. Box 817                               [_____]    Hand Delivery
Pocatello, ID   83204                      [_____]    E-mail
Telephone: (208) 233-2001                  [   X   ]     E-filed
Facsimile: (208) 232-0150


        /s/    *John D. Bowers*
        John D. Bowers